Good morning. Richard Levy for the Appellant Wheeler. There's just a couple of points I'd like to highlight. First, the question of prejudice. There's a risk here of being led astray by the cold record. Of course, anyone who reads the record rather than study the live witnesses is going to have some doubt as to how close a case this really was. But the jury's conduct told us something. After just two days of testimony, the jury had to deliberate for two days, half a day on each day. KENNEDY Well, a court of one day is part of another day. WHEELER Right. That's right, Judge Weinheim. KENNEDY You add them up, it's probably one day. WHEELER One full day, yes. They asked to listen again to the key tape recording of the drug deal. And the only reason I can surmise for that is to see if there's really some indication that, some hint in what Wheeler said, that this really was going to be a drug rip-off rather than a bona fide drug deal. And they asked for a read-back of Detective Kaiser's testimony on the crack cocaine in the shoebox. If this were such a clear-cut case, it's inexcusable how the jury would constantly interrupt its deliberations for these things. It's evident that there was at least one juror who was willing to give serious thought to Wheeler's defense. And that, no doubt, is based on the demeanor. Wheeler, of course, himself testified. KENNEDY Well, you know, this is all fine, but you haven't got much way of claims of error here. I mean, what are your real beliefs here? WHEELER Well, let me take the second. KENNEDY So let's say it's close. WHEELER Let me take the second error first, Judge Kaczynski. Everything depended on Wheeler's credibility. Apart from some telltale circumstantial evidence, everything depended on him. When the trial court asked two pages' worth of questions, not to clarify anything, but with the evident intent of showing that, when he pleaded, he either was guilty or he was lying to the judge in the prior case, I think that, whatever the trial court's objective intent, that sends an unmistakable message to the jury that this is a guy who is not to be believed. And once the jury gets that impression, the case is over, because, again, everything depended on Wheeler. The same, and I would point out, there's no allegation here that the trial court was trying to influence, subjectively trying to influence the jury. The problem  KENNEDY I mean, what made him unworthy of belief is the fact that his answers to those questions were not, you know, made him out to be sort of a liar. I mean, I don't know. WHEELER I wouldn't go that far, Judge Kaczynski. If he, his answers to the questions is, I wanted the judge to believe it, I said it, it wasn't true, and I said it so the judge would accept the guilty plea. KENNEDY Right. WHEELER That was the essence of it. KENNEDY And the court conveyed to the jury that there is, that once you say, yes, I'm guilty, you can take a plea to guilty because it's in your best interest. But by hammering home these questions, weren't you represented by a lawyer, wasn't there a procedure for factual basis, the judge intimated, pretty clearly intimated, that there is no such procedure, that either you plead guilty, either you are guilty, or you're improperly presented to the court. And it's the court's questions that made it impossible for the jury to consider the third possibility, which was, it was in his best interest. That's an intuitive, it would have been intuitively clear to the jury that that's why innocent people sometimes plead if it weren't for the court's questions. KENNEDY How is that any different from saying, yes, I lied to the judge and I said I was guilty, but I didn't think he'd accept the plea otherwise? Isn't it the same as saying, you know, I thought it was in my best interest to lie? I mean, those two things are really no different. GERGEL He made those admissions. In response to the trial court's questioning, though, it would never have come out so starkly. KENNEDY Counsel, if the prosecutor had asked precisely the same questions that the judge asked, would you be here complaining? GERGEL I'm not on that issue, not at all, Judge Visar. It's precisely the same. KENNEDY In the quality of the questioner that gave more weight to the answers to those questions? GERGEL Exactly, Judge Visar. KENNEDY Was there any instruction by the trial judge with respect to this extensive cross-examination? GERGEL There was a boilerplate instruction, I think you may be alluding to. KENNEDY A boilerplate? There was an instruction? GERGEL Yes. KENNEDY All right. GERGEL Yes, yes. KENNEDY What did it say? GERGEL The instruction said not to take a, I'm paraphrasing, not to take a cue from the courts, from anything the court did. KENNEDY Do you think that was sufficiently curative to diminish the overwhelming reputation of a judge asking these questions in the face of a jury? GERGEL I don't, Judge Visar. KENNEDY Did you propose any contrary instruction that was stronger? GERGEL No. And that, no, at the trial level, no other admonition was proposed. KENNEDY Why not? If it's such a, such a serious flaw. GERGEL I think the reason is, I'm sorry. KENNEDY As seen by you. GERGEL I think the reason is the same reason it's error on appeal is this is a bell that can't be unwrung. Once the jury gets, gets, once the jury understands that this is the, correctly or incorrectly, that this is the trial judge's view of credibility, nothing the court can say is going to change that. And I cite the Stevens case in the brief, case of this Ninth Circuit, that pretty much holds the same. In the Stevens case, the judge expressly said, I don't think the defendant is believable, I think he's guilty. But there's really no substantive difference between expressly stating that and implying that, or at least saying words that give the jury. KENNEDY I'm running out of time. Can you tell me why this was a close case? What, what would have given the jury problems? GERGEL It must be, Judge Reinhart, it must be something in the demeanor. I will not stand here and say that on the cold record this was a close case. That would be preposterous. But when the jury has to spend two half days, and after only two days of testimony, and to get read back of the critical tape phone call, something is going on, and I can only surmise that they heard. KENNEDY That's your basis for saying it's a close case, the jury conduct. GERGEL Right. KENNEDY Nothing else. Because the case certainly doesn't seem to be close on the record. GERGEL Exactly. And I would concede that. Although there are some telltale circumstantial signs that I talked about in the brief. I mean, your theory about Detective Liger, or Officer Liger, or whatever, I don't find any support for it in the record. I don't find anything odd about the fact that he drew a map. GERGEL He drew the map when he was not the one involved in the search. And the detective... KENNEDY Well, I said he was in and out during the time they were discovering the materials. So what's strange about his drawing the map? You would expect a map to be drawn or authorized or approved or checked by the detective who actually does the search and knows where things were found. Here, Detective Kaiser was surprised when he was shown the map during cross-examination. He said, yeah, that's... KENNEDY Another officer who was in the room with him made a map, and just for a record. GERGEL I would say you... KENNEDY I don't find anything peculiar about that. Well, I would say your earlier statement, Judge Whitehart, that he was in and out. He wasn't constantly present during the search. In fact, he was not present at all when Detective Kaiser was actually doing the search. But that's why... GERGEL You have confessions to two different DEA agents. KENNEDY Absolutely, which Wheeler denies. GERGEL I mean, isn't the case overwhelming? KENNEDY If that's the case, and I won't argue that the cold record goes a particular way. If that's the case, why wasn't this a half-hour jury deliberation? Wheeler testified and looked the jurors in the eye. The detectives testified and looked the jurors in the eye. Something is going on here. Otherwise, this would have been a half-hour verdict. And in that context... And, you know, sometimes they take quite a long time. They can take weeks or a week, or they can take a couple of months sometimes even. But the fact of the fact that it took part of two days, it doesn't really seem to be enough to show that the case is a very close one. But everything you've pointed out, Judge Reinhart, as to why this is an overwhelming case, seems to me to support Wheeler's position that, sure, although sometimes jurors take a long time, of course we can only speculate, but something is going on here. Two full half-days. Two half-days is awfully long for two days of testimony in an open-and-shut case with readbacks and so on. And that's why I can only surmise, and on prejudice all we can do is inform speculation, I can only surmise that they looked these guys in the eye and at least one juror was profoundly bothered. Thank you, Your Honor.   Thank you. Good morning. I may have pleased the Court, Beyonce U. Kim for the United States. This was not a close case. It was a case in which the jury deliberated for a total of approximately one day. That was not a lengthy period of deliberation for the jury, and there's nothing in the record indicating that this was not a jury that was very deliberate and considerate of the evidence as opposed to a case that was close in any way, given that there was a confession, given that a search of the defendant's apartment turned up all of the contraband and drug paraphernalia that he was eventually charged with, given that there were recorded conversations of the defendant in which he talked about his co-conspirators and about the drug transaction. Why did they need to listen to the tape again if it was so clear-cut? I don't know, Your Honor, but it was a lengthy tape recording that was played during the trial, and there was a lot of information in that tape about the shape of the transaction, the drug transaction that was to come, about details of that transaction. This was a transaction in which the defendant was dealing with the two Mexicans, supposedly, and after they had all of this arrangement, they waited until he could get in touch and get the drugs delivered, right? That's correct, Your Honor. How is it that nobody, none of the surveillance people who had the apartment under surveillance during this entire period saw the delivery? I don't know, Your Honor, but what we do know, Your Honor, is that there were surveillance photos of the people who were eventually charged as co-defendants in this case, and there was a- They were acquitted. That's correct, Your Honor. They were acquitted. But they did have the apartment under surveillance at the time a delivery was supposedly made, and nobody saw it. There are a couple of possibilities, Your Honor. First of all, it's possible that the defendant, when he had the conversation that was recorded, I believe, by the Drug Enforcement Administration, and told the DEA undercover agent that he had the drugs, that it wasn't that he had just received the drugs, but that he had had the drugs for some length of time. The other possibility, Your Honor, is that the surveillance was simply imperfect, and I think that there are many cases in which surveillance agents aren't able to see, given the multiple ways in which you can enter buildings oftentimes, that the drugs are actually being delivered. What's undisputed, however, is that a search of the defendant's apartment immediately following his arrest turned up the five kilograms that- That could be what troubled the jury, is as they heard the government's story and saw that there was no delivery, that maybe the defendant's theory that it was Detective Liger who planted the drugs, maybe that appealed to some jurors under that circumstance. It's possible, Your Honor, but I think that in light of all the other evidence putting aside the whole issue with respect to Detective Liger, in particular, the defendant's confession to multiple DEA and law enforcement agents following his arrest, and all the corroborating evidence that was found during the search, including the loaded handgun, the drug paraphernalia, the drug scales, the kilograms of cocaine, the crack of cocaine, all of those provided an ample basis for conviction. With respect to the defendant's claim of error and the judge's questioning, I think that it's useful to emphasize what the legal standard is for evaluating such a claim. In the Mostella case, the court, this court, said that they have to show actual bias or an abiding sense that the questioning left the impression of partiality. But the Mostella court didn't stop there. In Mostella, then-judge, now-Justice Kennedy, further wrote that there has to be an extreme overstepping of the proper judicial role. And similarly, in the DeLuca case, this court said that there has to be a base of climate of partiality. What it looks like to me is that the judge was not that happy with the way the witness was examined, so he was going to show them how it's done. I don't think that's quite accurate, Your Honor. I mean, the defendant tried to weasel out of the guilty plea. Tried to find a way of sort of trying to make it sound like she both told the truth and he wasn't guilty, which, of course, can't be true. It's important to look, Your Honor, in answering that question at the judge's questioning in context of the examination that had been done both by government counsel and defense counsel by that time. By the time the judge asked the defendant those questions, the defendant had already admitted that he had pled guilty in order to simply get out of jail, not because he was guilty. He hadn't admitted it. That was his position. He wasn't admitting it. He was trying to assert that, that he wasn't really guilty. That's right, Your Honor. And that wasn't in response to the prosecution. That was his version. That was in response, Your Honor, to his own lawyer's questioning. That was what they were trying to establish. Exactly, Your Honor. And the judge was trying to show, to undercut that story. To the contrary, Your Honor. What the judge's questioning revealed was precisely how it was that that was able to occur. That he lied to the court. That he lied to the court in order to get out of jail and that he pled guilty to the 1997 conviction, not because he was guilty, but simply because he wanted to get out of jail. The judge didn't do what you say he did in your brief, that he's just trying to clarify the circumstances. That's not exactly an accurate statement of what the judge was trying to do. Yeah, the judge was trying to get him to admit that he was a liar. I don't... Which is pretty, you know, you're testifying on the stand. That's the worst thing you want to say. Yes, I admit I lied on the oath. Your Honor... It tends to undermine your credibility. I would respectfully disagree. I don't know for certain... Do you think he was just trying to clarify the circumstances under which this occurred? Your Honor, I don't know exactly what was going through... Is that what you think? You still think that's what the judge was trying to do? Just explain the circumstances? The procedures? Your Honor, the reason why I think that that's one possible and plausible interpretation of what was going through the district judge's mind was because the defendant had already stated the principal substance of what he said in response to the judge's questioning. In other words, he had already said that he pleaded guilty, that he was not in fact guilty, and that he pleaded guilty simply in order to get out of jail. That is exactly what the defendant then essentially repeated in response to the district judge's questions. Except that he had to, in answering the district judge's more pointed question, he had to say, well, that's right, I must have lied on the oath. If you put what I said before together, you can say those two things,  that's a little different to get the defendant to actually admit it himself. Say, yeah, you're right, I did lie, and I didn't mean for the judge to believe me. Again, Your Honor, I don't think that was a preordained result of the district judge's questioning. Well, how could it be? Once he says, I pled guilty, and he then also says, I didn't do it, how could the result be anything other than, well, I guess I lied when I told the judge I did do it? Well, because one of the main arguments that the appellant presents on this appeal is that the district judge was basing his questions on an erroneous understanding of what California law requires with respect to individuals who plead guilty. It's quite plausible that he was making an inquiry as to whether this was one of those situations. That's part of the way his questioning went. I think Judge Fiesa has a question. Yeah. Quite to the contrary. The trial judge was following the standard process of taking a plea with this defendant as to his past conduct. I'm sorry, Your Honor, this state? And he was persistent in not allowing counsel to interrupt at any stage until he got to the bottom line of, I did it. You're referring to Judge Fiesa's, the district judge's questions. Yes, right. Trial judge. Your Honor, the district judge's questions were focused and I think to understand why they are focused, it's useful to look again at the testimony in context. The defendant, through his counsel, was repeatedly engaging in long narrative answers and I think that it's a fair reading of the transcript that the district judge was frustrated by all of that. I don't think, however, that the questions themselves revealed any pervasive climate of bias. The appellant himself concedes that there were no other incidents like this. Why don't you look at page ER 177, line 15. Yes, Your Honor. Yes, Your Honor. Actually, let's start at line 5. The court, did you admit to the crime? The witness, I had to. The court, and was that the truth? The witness, whether it wasn't true, whether it wasn't true, but I went on and did it anyway. The court, so you wanted the judge to believe it was true when you said it, though? The witness, well, sometimes, Mr. Fiesa, let me. The witness, being in jail, just answer my question. This is the court speaking again. Did you want the judge to believe that it was true? You wanted the judge to take your guilty plea. The witness, yes, at that time, yes. And you knew if you told the judge that you didn't commit the crime, he might not have taken the plea. The witness, no, he wouldn't have took it. Judge Kuczynski, as you noted earlier in this argument, the judge's questions were eliciting precisely what the defendant had already testified to and was eliciting what was just a logical inference from what the defendant had already testified to, more specifically. If it already testified to it, why did the judge have to elicit it? Well, Your Honor, I think that that is why one plausible interpretation of the purpose of this line of questioning was to clarify exactly what the process is in state court. What difference did it make what the process was? He said that he pled guilty, and then he said it wasn't true. Your Honor, the question may have been eliciting cumulative... The defendant said, I just want to make it clear to everybody that he lies to the court. Is that what he wanted to make clear? Well, Your Honor, that's ultimately what the defendant testified to. I don't know if there was any logical way for him to testify. The prosecutor then followed up with further cross-examination and elicited, well, aren't you lying today in order to get out of jail? The district judge didn't pursue that line of questioning. Having been handed that kind of, you know, nice present by the district judge, the district judge gets him to admit that he lied before another court at another time. Yes, Your Honor. This is so far that the prosecutor takes and says, well, you know, you lied before another court another time. You're probably lying today before this court as well. And that's what did happen, Your Honor. So driving home the point that the district judge had set up for him very nicely. The point, though, Your Honor, and I know that I'm out of time, but if you'll permit me, the point is that the district judge exercised restraint. The district judge did not, as in the Pena-Garcia case, go on to threaten... You know, most judges exercise restraint by saying nothing. Most of the way I understand most trial judges exercise restraint, they rule on objections and then say nothing at all. You know, judges sometimes go through entire trials weeks long and never question a witness. That's correct, Your Honor. I mean, you must have seen trials like that. Now, that's restraint. What we're dealing with may be okay. That sounds like an activist. No comment on that, Your Honor. But, again, the point is that viewed in the context of the entire testimony by the defendant and certainly the judge... Let me ask you something else, just slightly different. Let's say after the witness had testified, the judge had turned to the jury and had said, ladies and gentlemen, I just want you to notice that the defendant here has testified and he's pretty much admitted that he's lying in court. Would that have been okay? No, it would not, Your Honor. Why not? Well, because... That's a logical inference. He said, look, I pled guilty, I wasn't guilty, and then the prosecutor comes and asks him and says, well, if you said you were guilty, but you said you were guilty even though you weren't guilty, and the witness says, yes, I did it because I wanted them to accept the plea. So after that is all said and done, the judge turns to the jury and says, I want you all to understand that, you know, what the witness essentially has done here, what the witness has done here on the stand, he's admitted that he lied to another court at another time. Not okay? It would not be okay, Your Honor. Why not? Because it would be gratuitous, first of all, and second of all, because that would mean that the judge was commenting on... Gratuitous. I'm sorry. I'm sorry. What does gratuitous mean? Is that a legal term? Perhaps. I haven't looked it up in Black's Law Dictionary, but... Well, the questioning was not gratuitous. Yeah, that's the question I have. Why was the questioning not gratuitous? Well, I thought you were asking me to respond to whether if the judge made a comment on the testimony after the testimony... But that's the test. It's no good if it's gratuitous. Then don't you lose, because he asked a lot of questions that were gratuitous? Well, not quite, because I had another point, which is that it's not simply gratuitous, but also... You started with a point that's irrelevant. So you said it's gratuitous. Perhaps my... You could also have said it was Tuesday, or you could have said it was Los Angeles. It wouldn't have made any difference, but it would have taken up time. Perhaps my first point was gratuitous, but the second point, Your Honor... Yeah, let's get to the good point. ...was that unlike, just like in the Stevens case that the appellant's counsel referred the court to, in that situation, that hypothetical, which didn't happen here, the judge would be commenting on the question in a way that directly went to the defendant's credibility. That's clearly not what happened in this case. The defendant's done much more to destroy his credibility than he did with his cross-examination. Again, Your Honor, I would respectfully disagree. What are you going to do then to say, look, I just want to make it clear that what you've done is lied to the court in the past. And that's... That's true. And that's essentially what the defendant had already testified to, Your Honor. And the fact that the prosecutor then followed up on that line of questioning doesn't really go to the issue at hand because the issue is whether the judge is questioning... I think you must have missed the point of my question. If the judge comes out with a declaratory statement saying, this, ladies and gentlemen, I want you to understand that this witness just admitted he lied to another court another time, you say that's bad. And the way you distinguish what the judge did here is, which essentially sent exactly the same message to the jury, is because he did it in the form of questions. And that's your big distinction. Yes, Your Honor. I mean, it's very hard to tell, to read the two pages of cross-examination from the judge without getting the message, hey, Mr. Witness, you're a great big fat liar. So your distinction rests on the fact that all the things that the judge said are in the question mark. Your Honor, I do think that there's a difference when you declare something from when you actually just ask a question. You're agreeing with me. No, I think there's a big difference. You're agreeing with me that the difference is that these were questions as opposed to an outright statement. So if you made an outright statement, bad, question, good. That's the distinction on which you were stressed on. I think it's one important distinction. And this is why, Judge Kaczynski. What have you said to the witness? Let me ask you a question, Mr. Witness. Isn't it true that you are a big fat liar? You think that would have been okay because it ends in a question mark? And because it begins to say, let me ask you a question? No, Your Honor. And that's essentially what happened in the Pena-Garcia case where the district judge – That's what happened in this case. Well, I would respectfully disagree, Your Honor. The questioning really simply amplified what the defendant had already testified to and what the jury probably had already logically taken from – So it was really just to say to the jury, in case you've got any doubt that this guy is a liar, I want to make it clear to you that he is a liar. Well, the district – And I'm the judge. Well, you know, that may have been the effect of the judge's questioning, Your Honor, but the issue at hand is whether that questioning created a pervasive climate of partiality. Well, it goes to the heart of the defense. The only issue here was credibility because you have a lot of officers saying one thing and you have the defendant saying another thing, and his whole case depends on whether you believe him. But given, Your Honor, that – If it's correct that the judge was telling the jury, this guy is a liar, that's my opinion, it's pretty significant. But that's not what happened, Your Honor. It's substantial. He didn't say that. There was a limiting – And there was a limiting instruction. And if you look at the cases, like the Pena-Garcia case or even the Stevens case, where in the Stevens case, it's somewhat similar to Judge Kaczynski's hypothetical in that the judge basically says, you, Mr. and all the jurors, you can do whatever you want, but just for your information, if this case were up to me, I would vote to convict or to acquit. Was there a limiting instruction in that case? I don't recall if there was a limiting instruction. Probably there was. There was, Your Honor, yes. There was. And there was one in this case as well, and the questioning was much, much more mild and isolated and repetitive in terms of the substantive testimony that was elicited than in either the Stevens case or the Pena-Garcia case. All right. Well, we've certainly kept you well over your time, so thank you very much. Thank you, Your Honor. I believe my time has almost stopped. Unless the Court has any questions, I will. I think the Court grasped the seriousness of what the trial court did. I think we understand the case fairly well. Thank you. Okay. Thank you. The next case on the calendar is the United States. Are you going to submit this one? Yes. This case is submitted.
judges: Beezer, Reinhardt,kozinski